# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 21-0971V**

TODD KATZ,

Petitioner,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES,

Respondent.

Chief Special Master Corcoran

Filed: August 25, 2026

*John Robert Howie, Howie Law, PC, Dallas, TX, for Petitioner.*

*Sarah Christina Duncan, U.S. Department of Justice, Washington, DC, for Respondent.*

## RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On February 22, 2021, Todd Katz filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act").[3] Petitioner alleges that he suffered a shoulder injury related to vaccine

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] Most likely due to the proposed removal of SIRVA from the Vaccine Injury Table, Petitioner originally filed a cursory petition less than six months post-vaccination. *See* National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table, Proposed Rule, 85 Fed. Reg. 43794 (July 20, 2020). The day after this claim's initiation, the effective date for this rule was delayed, and the rule was rescinded in late April 2021. *See* National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table, Delay of Effective Date, 86 Fed. Reg. 10835 (Feb. 23, 2021) (delaying the effective date of the final rule until April 23, 2021); National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table, Withdrawal of Final Rule, 86 Fed. Reg. 21209 (Apr. 22, 2021). On January 20, 2023, Petitioner filed an amended petition, providing additional detail and medical record citations. ECF No. 22.

administration ("SIRVA"), as defined in the Vaccine Injury Table, after receiving an influenza ("flu") vaccine on September 4, 2020. Amended Petition at 1, ¶¶ 1, 17.

For the reasons set forth below, I find Petitioner has established that he meets the requirements for compensation, and I award damages in the amount of **$25,000.00, for actual pain and suffering.**

## I. Factual Findings and Ruling on Entitlement

### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). A petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *See Cucuras v. Sec'y of Health & Hum. Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Hum. Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Hum. Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

The Vaccine Act set forth requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement which must be satisfied for both Table and non-Table claims. In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. See Section 11(c)(1)(A)(B)(D)(E).

Additionally, a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C). The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10) (2017).

### B. Medical History

At the time of his vaccination, Dr. Katz was a 60-year-old retinal ophthalmologist on disability,[4] with a medical history which included multiple sclerosis ("MS"), low back pain attributed to cervical stenosis, carpel tunnel syndrome, and optic neuritis. Ex. 2; Ex. 4[5] at 34-135; Exs. 6-7, Ex. 8 at 10-27. His spouse is a physician's assistant ("PA"). Ex. 17 at ¶¶ 1-2.

On September 4, 2020, Petitioner received the flu vaccine alleged as causal. Both the original vaccine record and a second version (obtained by subpoena) did not include information regarding the method and site of administration.[6] Ex. 2; Ex. 4 at 13. In their declarations,[7] Petitioner and his spouse (also present and receiving a flu vaccine at the time) stated Petitioner's vaccine was administered intramuscularly in his left arm. Ex. 1 at ¶ 2; Ex. 18 at ¶ 2 (Petitioner's declarations); Ex. 17 at ¶ 3 (his spouse's declaration).

During the five weeks following vaccination, Petitioner underwent unrelated laboratory testing on two occasions. Ex. 4 at 136-37. And he participated in a 30-minute video appointment with his neurologist on October 1, 2020, less than one-month post-vaccination, for follow-up treatment of his MS. Ex. 5 at 2-4. Although Petitioner reported no new symptoms or MS "attacks" - attributed to his long-term medication - the neurologist discussed a possible change in medication.[8] *Id.* at 3-4. Petitioner "decided to get a repeat brain MRI[9] before making a decision." *Id.* at 4. There is no mention of any left shoulder symptoms in this medical record.

---

[4] Legally blind in the right eye, Petitioner was unable to work and "on disability . . . due to visual issues related to multiple sclerosis and optic neuritis." Ex. 8 at 25.

[5] In response to a request for subpoena authority, granted in late December 2021 (ECF No. 14), Petitioner provided a more complete version of his primary care provider's ("PCP's") medical records, containing 36 additional pages and labeled as Exhibit 4. I will reference this version as opposed to the originally obtained version labeled as Exhibit 3. *Compare* Ex. 3, ECF No. 23-3 *with* Ex. 4, ECF No. 23-4. Both versions were filed in the same group of medical records on January 20, 2023.ECF No. 23.

[6] The PCP records provide this additional information for only the latest vaccine received by Petitioner – a COVID vaccine administered intramuscularly in Petitioner's left deltoid on September 24, 2021. Ex. 4 at 13-17. Presumedly, the PCP's computer system does not retain this information for prior vaccinations.

[7] All declarations submitted in this case were signed under penalty of perjury as required by pursuant to 28 U.S.C.A. § 1746. Ex. 1 (signed by Petitioner on January 20, 2023); Ex. 17 (signed by Petitioner's spouse on August 20, 2025); Ex. 18 (signed by Petitioner in August 2025, with no date provided).

[8] It appears that at least some of Petitioner's medication was administered via injection as it was noted that he "continue[d] to hate his injections." Ex. 5 at 3.

[9] In this medical record, it was noted that Petitioner's last MRI was more than five years ago. Ex. 5 at 2.

Petitioner first complained of shoulder pain[10] in an October 10, 2020 message to his PCP, reporting that both he and his spouse (along with their daughter who received a flu vaccine the previous day) experienced shoulder pain due to their vaccinations being administered too high. Ex. 9. Although their daughter's pain "fade[d] over the weeks" and his spouse "feels her pain, while still present, is beginning to resolve one month out," Petitioner's pain and limited range of motion ("ROM") continued. Describing his condition as "generally miserable," Petitioner expressed concern that he was suffering from SIRVA and suggested that the nurse who administered their vaccinations and others may "need[] training on giving safe vaccines." *Id.* Although not reflected in the medical records, Petitioner asserts that his PCP later called him, providing him with the names of two orthopedists in the area. Ex. 1 at ¶ 6.

On October 19, 2020, Petitioner messaged an orthopedist (a former medical school classmate with a practice in Sam Franscisco, California) describing his vaccine-related injury and questioning what treatment he would recommend. Ex. 10 at 4. The orthopedist suggested pain medication and a steroid injection (rather than surgery) if Petitioner's condition did not improve. *Id.* at 3-4.

Petitioner states that on November 11, 2020, after his symptoms continued, he called one of the local orthopedists recommended by his PCP. Ex. 1 at ¶ 8. He recalls that, when they spoke the next day, the orthopedist "had never heard of SIRVA" but recommended that he come to the clinic for x-rays and a steroid injection. *Id.* Petitioner declined "due to the Covid risk at the time [and] [his] lack of confidence in [the orthopedist's] experience." *Id.* To support his recollection, Petitioner submitted a list of six telephone numbers he called from October 9 through 12, 2020, which appeared to be downloaded from a website and included three calls to an orthopedic clinic on November 11th. Ex. 12.

On November 14th, Petitioner again messaged the orthopedist he knew from medical school. Ex. 10 at 2. Noting that the local orthopedist did not seem to have much expertise in this area but positing that "not much expertise is required to inject steroids into [his] shoulder," Petitioner asked whether it would be prudent to obtain a shoulder MRI first. *Id.* Stating that an MRI [wa]s not absolutely necessary prior to an injection," may delay treatment, and would likely only reveal an inflamed bursa, Petitioner's friend recommended obtaining the steroid injection first. *Id.*

[10] The email does not specify which shoulder. Ex. 9.

Eight days later, Petitioner informed his former classmate that his shoulder "had some slight improvement on Meloxicam[11] for just over a month," and he was "a little skittish on the shoulder injections . . . [but] d[id]n't want to miss the window where such an injection might help." Ex. 10 at 1. In response, the orthopedist opined that "[i]f you are gradually improving, then an injection is not needed, [but] [i]f improvement has stalled, [he] would recommend the shot." *Id.*

On November 24, 2020, Petitioner attended a neurology appointment for follow-up treatment of his MS and evaluation of new onset of right arm paresthesias. Ex. 8 at 28. It was noted that Petitioner had been diagnosed with MS In 1997, and had been stable on his current medication with no "new flairs or exacerbations of his MS." *Id.* Although he reported "intermittent right arm paresthesias when looking up," the neurologist observed "no evidence of demyelinating disease." *Id.* After again discussing different medications, the neurologist recommended no change at this time. *Id.* at 30. For Petitioner's right arm symptoms, the neurologist suggested physical therapy ("PT") which Petitioner declined and a surgical consult which Petitioner stated he would pursue. *Id.*

Petitioner's *left* shoulder pain is not mentioned in this record, but there is one entry describing "mild left deltoid giveaway" under motor strength. Ex. 8 at 29. In his supplemental declaration, Petitioner insists that he "mentioned [his] shoulder . . . in passing during [his] neurology appointment." Ex. 18 at ¶ 3.

In February 2021 (and shortly before initiating this claim), Petitioner submitted a Vaccine Adverse Event Reporting System ("VAERS") report, describing "[t]errible shoulder pain with extremely limited range of motion." Ex. 14 at 7. He reported taking Meloxicam and gaining 70 percent improvement "over the past months." *Id.* Petitioner also contacted his PCP on two occasions seeking details related to the flu vaccine he received and his eligibility for the COVID vaccine, COVID test kits and a change in medication. Ex. 4 at 27-29. Explaining that he began to experience a rash two days earlier, Petitioner requested a change from Meloxicam to Celebrex. *Id.* at 27.

During the subsequent seven months, Petitioner's spouse called his PCP on two occasions with requests related to his MS – authorizations for further treatment with a specialist and an MRI. Ex. 4 at 23-26. There are no medical records reflecting other treatment during this time, but Petitioner received COVID vaccines on February 25 and March 18, 2021. Ex. 4 at 13.

[11] Meloxicam is "a nonsteroidal anti-inflammatory drug used in the treatment of osteoarthritis, administered orally." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 1126 (32th ed. 2012).

On September 14, 2021, Petitioner attended his first and only visit with the local orthopedist whom he had called in November 2020, seeking treatment for left shoulder pain and bursitis attributed to a vaccine reaction. Ex. 15 at 1-4. He reported persistent pain since receiving a vaccine on September 4, 2020, "approximately 70% improvement," and continued "discomfort [of] 3 to 4/10 in severity." *Id* at 2.

Upon examination, the orthopedist observed "some mild tenderness over the posterior joint line" and some reduced ROM in the left shoulder. Ex. 15 at 3. Noting that x-rays taken that day revealed no abnormal findings, the orthopedist opined there was "no indication for surgery" and he was "optimistic" Petitioner's symptoms would continue to improve over time. *Id.* at 4. The orthopedist provided Petitioner with a home exercise program ("HEP") and told him to "[f]ollow up as needed if [the] symptoms persist[ed] over the next several months for consideration of a subacromial corticosteroid injection." *Id.*

There is no evidence showing Petitioner pursued any additional treatment for his left shoulder symptoms, and he received a third COVID vaccine in the left deltoid on September 24, 2021. Ex. 4 at 15. In their January 2023 declarations, Petitioner and his spouse insisted that he continued to experience some SIRVA-related symptoms. Ex. 1 at ¶ 16; Ex 17 at ¶ 8.

In his supplemental declaration, signed in August 2025, Petitioner clarified that the terrible pain that he initially experienced (and mentioned in the VAERS report) lessened over time until he reached the 70 percent improvement he reported in February 2021. Ex. 18 at ¶¶ 5-6. Thereafter, his improvement plateaued, and he decided to seek treatment in September 2021. *Id.* at ¶ 5.

### C. Parties Arguments Related to Entitlement

Initially, Respondent objected to compensation because Petitioner had allegedly failed to provide the evidence needed to establish six-months of residual effects, or injury severity – a requirement for all Table and non-Table claims. Rule 4(c) Report, filed January 18, 2024, at 8-10, ECF No. 33; *see* Section 11(c)(1)(D)(i). He then raised additional objections – involving Table SIRVA requirements related to symptom location and reduced ROM in an amended Rule 4(c) Report, filed six months later.[12] Amended Rule 4(c) Report, filed June 17, 2024, at 11-12, ECF No. 35; *see* 42 C.F.R. §

[12] In his initial Rule 4(c) Report, Respondent stated that "[b]ecause the six-month issue in this case is dispositive, [he] d[id] not address the relative merits of this case in other respects." Rule 4(c) Report at 2 n.2. He requested to file a supplemental report "in the event of future proceedings." *Id.* In early June 2024, Respondent was informed of the importance of addressing all objections in his Rule 4(c) Report and instructed to file an amended Rule 4(c) Report setting forth any and all objections to compensation. *See* Informal Remark, dated June 3, 2024; Non-PDF Scheduling Order, issued June 11, 2024.

100.3(c)(10)(iii); *Bolick v. Health & Hum. Servs.*, No. 20-0893V, 2023 WL 8187307, at *7-8 (Fed. Cl. Spec. Mstr. Oct. 19, 2023).

To illustrate the mildness of Petitioner's symptoms, Respondent emphasizes Petitioner's failure to seek treatment until September 2021, approximately one-year post-vaccination, or to mention his left shoulder pain to the neurologist he saw on in late November 2020. Amended Rule 4(c) Report at 8-9. He insists that "the gaps in the submitted evidence break any potential chain of causation between Petitioner's September 4, 2020 flu vaccination and his complaints of left shoulder pain in September 2021" and thus, prevent him from establishing the required symptom duration. *Id.* at 9.

Countering the rationale Petitioner provided for his failure to seek treatment - concerns related to the worldwide COVID-19 Pandemic and a lack of confidence regarding the local orthopedist he contacted by phone - Respondent observes that Petitioner received two doses of the COVID vaccine in March 2021, and the orthopedist's advice mirrored that of Petitioner's medical school classmate – an orthopedist he trusted and sought advice from on multiple occasions. Amended Rule 4(c) Report at 9-10. Respondent insists that "[u]ltimately, it is illogical that someone suffering from 'terrible' pain with limitations of the kind [P]etitioner and his wife claim[ed] persisted through January 2023, would not seek medical treatment for more than a year (and on only one occasion)." *Id.* at 10.

Regarding the requirements for a Table SIRVA, Respondent emphasizes the lack of situs information in the vaccine record, insisting it prevents Petitioner from establishing that his symptoms were "limited to the shoulder in which the vaccine was administered." Amended Rule 4(c) Report at 11. Observing that "the first and only time in which a medical provider documented reduced ROM was on September 24, 2021," Respondent contends that, even buttressed by Petitioner's subjective reports, it "does not rise to preponderant proof." *Id.* at 11.

On August 26, 2025, Petitioner filed a motion requesting that I find him entitled to compensation, and to award him $25,000.00 for pain and suffering. Petitioner's Motion for Ruling on the Record on Entitlement and Damages ("Brief") at 1-2, 21. To support entitlement, Petitioner did not provide any comprehensive argument. Instead, he listed the evidence which he believes satisfies each requirement - often citing his or his spouse's declarations. *Id.* at 10-18.

In response, Respondent disputes Petitioner's assertion – that he mentioned his left shoulder pain at the neurology appointment in late November 2020. Respondent's Responsive to Brief ("Opp."), filed Oct. 24, 2025, at 11-12, ECF No. 38. He insists that claim is not supported by the information found in the medical record from that visit –

noting "mild left shoulder giveaway but . . . no indication that [P]etitioner reported left shoulder pain at that time." *Id.* (citing Ex. 8 at 29 – the neurology visit record).

After reiterating his prior arguments, Respondent provides citations showing "[t]he Court has previously dismissed cases based on similar problematic facts." Opp. at 14. He maintains that "[a]s the record now stands, there is no evidence to support a finding that [P]etitioner suffered the residual effects of complications of his alleged left SIRVA for more than six months." *Id.*

In his reply, Petitioner contends that his complaint of left shoulder pain at the orthopedic visit in late September 2021, which mirrors the description he provided in his VAERS report submitted in February 2021, is sufficient to establish the required six-month severity. Petitioner's Reply Brief on Entitlement and Damages ("Reply"), filed Nov. 7, 2025, at 11-12, ECF No. 39. He maintains that the mildness of his symptoms, treatment gaps, and attempts at self-treatment do not prevent him from satisfying this requirement. *Id.* at 13-17.

Even ignoring this later complaint, Petitioner insists that the description he provided in the VAERS report of 70 percent improvement after more than five months post-vaccination shows "it is more likely than not that [his] symptoms were not fully resolved over the following 20 days." *Id.* at 19. Distinguishing the dismissed cases cited by Respondent, he favorably compares his facts and circumstances to several cases in which the severity requirement was satisfied. *Id.* at 17-18, 20.

Regarding other Table SIRVA requirements, Petitioner observes Respondent largely relies on a situs challenge. Reply at 2. Citing multiple medical record entries when he consistently linked his left shoulder pain to the flu vaccine and the assertions of his spouse who was present at the time (*id.* at 4-6), Petitioner insists that, other than this lack of situs designation, "the evidence is 100% clear and uncontradicted that [his] vaccine was administered in his left shoulder" (*id.* at 2).

Emphasizing his status as a licensed physician, Petitioner maintains that his reports of reduced ROM and the observations of the local orthopedist he saw in September 2021, are sufficient to establish that he suffered a reduction in ROM. Reply at 7-9. And he contends this evidence is supported by the recollections (provided under penalty of perjury) of his spouse – who also has extensive training and expertise as a PA. *Id.* at 9-10.

### D. Factual Findings Regarding Severity, Symptom Location (Situs), and ROM

A review of the record in this case reveals events which conform to the narrative Dr. Katz describes, except for some slight differences related to pain severity. Despite a several-month treatment gap, the record shows Petitioner sought input from his PCP, an orthopedist who is a former medical school classmate, and a local orthopedist on multiple occasions during the first three months post-vaccination. Exs. 9-13. Throughout these communications, Petitioner provided a consistent account of his symptoms and vaccine-related injury, with accurate references to the other communications. *See,* e.g., Ex. 10 at 2 (mentioning the call to a local orthopedist). Most importantly, Petitioner's later recollections in his VAERS report, the history provided when seeking orthopedic treatment in September 2021, and his declarations signed in 2023 and 2025, are consistent with this earlier information. *Compare* Exs. 9-13 *with* Exs. 1, 14-15, 18.

*Severity*

To establish the required six-month sequela, Petitioner need only show SIRVA-related symptoms through March 4, 2021 (assuming an immediate pain onset which the record supports). Petitioner correctly notes that even if his later symptoms were not connected to the SIRVA he suffered the prior year, it is unlikely that the symptoms he reported in February 2021 resolved in less than a month later. And there is no evidence to suggest that his later symptoms were unrelated.

Although Petitioner's symptoms clearly improved – beginning in late November 2020,[13] through February 2021 - there is a dearth of evidence depicting a *complete* resolution before the severity "cut-off" date. Rather, Petitioner insists that his symptoms plateaued in February 2021, and the evidence supports this assertion. Furthermore, Petitioner has provided reasonable explanations for the instances when he failed to seek treatment or mention ongoing symptoms which Respondent contends prevent him from establishing the needed six-month sequela.

It is understandable that Petitioner would be reluctant to pursue formal treatment and attempt to self-treat, given the ongoing worldwide COVID Pandemic; the medical expertise of both Petitioner and his spouse; the serious nature of his ongoing, albeit unrelated, medical conditions (MS and optic neuritis); his ability to seek the opinion of a trusted medical school classmate; and the relief he gained less than two months post-

[13] Petitioner acknowledged that he gained good relief by late November 2020, from the Meloxicam he began taking one month earlier. Ex. 10 at 1 (message to his former classmate). Although Respondent emphasizes the lack of information related to the origin of this prescription, it is likely that it was prescribed by his spouse (a PA) or his former classmate. *See* Opp. at 5 n.6. Petitioner may have even prescribed the medication himself – an action which is allowed under certain circumstances related to non-controlled substances.

vaccination from medication. As I have previously stated, "medical professionals tend to self-treat their shoulder injuries, delaying formal medical treatment at a much higher rate than other petitioners." *Hiatt v. Sec'y of Health & Hum. Servs.,* No. 23-1560V, 2025 WL 1542314, at *6 (Fed. Cl. Spec. Mstr. May 13, 2025); *accord. Leslie v. Sec'y of Health & Hum. Servs.,* No. 18-0039V, 2021 WL 837139, at *1 (Fed. Cl. Spec. Mstr. Jan. 28, 2021) (discussing the lack of medical records given petitioner was a doctor); *Rayborn v. Sec'y of Health & Human Servs.*, No. 18-0226, 2019 WL 4447391, at *4 (Fed. Cl. Spec. Mstr. June 7, 2019) (determining that petitioner's choice not to seek treatment initially was reasonable given her status as a nurse and relief obtained by pain medication). Although Petitioner received two doses of the COVID vaccine in March 2021, he was no doubt more hesitant than others to seek in-person medical treatment due to his MS and related disabilities.

Furthermore, Petitioner's failure to mention his left shoulder pain when seen by his neurologist is not fatal to his claim. It is common for a petitioner to omit any mention of SIRVA-related symptoms during an intervening medical encounter with a specialist treating an unrelated medical condition. *McGee v. Sec'y of Health & Hum. Servs.,* No. 21-0854V, 2024 WL 5349373, at *7 (Fed. Cl. Spec. Mstr. Dec. 5, 2024) (discounting such an omission when determining severity); *Dempsey v. Sec'y of Health & Hum. Servs.,* No. 18-0970V, 2021 WL 1080563, at *4 (Fed. Cl. Spec. Mstr. Feb. 17, 2021) (discounting such omission when determining pain onset). Even though a neurologist is more likely to be informed than other kinds of specialists, it was not unreasonable for Petitioner to neglect to mention this additional information, or for the neurologist to fail to include it in the medical record, given that the purpose of this appointment was to treat a far more serious concern - Petitioner's MS.

Additionally, the first neurology visit occurred on October 1, 2020, less than a month post-vaccination, at a time when Petitioner may have thought his symptoms would resolve. Ex. 5 at 2. And there *is* a brief mention of left arm giveaway in the record from the neurology appointment on November 24, 2020. Ex. 8 at 29.

Petitioner's lack of treatment is important when assessing the appropriate amount of damages, but it does not prevent Petitioner from establishing the needed six-month severity. Even mild and intermittent symptoms will suffice. In this case, the preponderant evidence supports Petitioner claim that he suffered the residual effects of his SIRVA for at least six months.

*Symptom Location and Limited ROM*

Throughout the record, Petitioner consistently attributed his left shoulder pain to the flu vaccine he received *in that arm* on September 4, 2020, and he reported suffering

a limited ROM on several instances. He repeated this history when seeking treatment in September 2021, and the orthopedist also observed reductions in Petitioner's ROM upon examination. Ex. 15 at 2-3. Specifically, the orthopedist assessed Petitioner as exhibiting a maximum ROM of 165 and 60 degrees with an ability to reach to the lower back on the left as opposed to 180 and 90 degrees with the ability to reach to the middle back on the right. *Id.* at 3.

Respondent appears to argue that the orthopedist's observations are not sufficient because they occurred almost one-year post-vaccination. However, as I have previously stated, there is no timing component to when reduced ROM must be established. *McNally v. Sec'y of Health & Hum. Servs.,* No. 20-1763V, 2024 WL 4024429, at *4 (Fed. Cl. Spec. Mstr. July 31, 2024); *Silacci v. Sec'y of Health & Hum. Servs.,* No. 21-1265V, 2024 WL 5295093, at *6-7 (Fed. Cl. Spec. Mstr, Dec. 5, 2024). And only *one* instance of reduced ROM is needed. Thus, even if I ignore Petitioner's earlier reports, the observations of the orthopedist who treated Petitioner in September 2021, would suffice. As is the case when assessing six-month sequela, the mildness and intermittent nature of the reduced ROM exhibited by Petitioner are highly relevant to damages, but do not prevent a favorable limited ROM finding.

Most importantly, there is a dearth of evidence to support a right-sided situs or the absence of any ROM reduction. Thus, the preponderant evidence supports the left-sided situs and limited ROM Petitioner's asserts. Petitioner has satisfied the Table SIRVA requirements related to symptom location and reduced ROM.

### E. Other Requirements for Entitlement

Respondent has raised no other entitlement objection, and the record contains sufficient evidence showing Petitioner has satisfied the other QAI criteria. *See* 42 C.F.R. § 100.3(c)(10)(i)-(ii) & (iv). There is no evidence of prior left shoulder symptoms or a current condition that constitutes a viable alternative cause. *See, generally,* Ex. 4 at 34-135; Ex. 8 at 10-27 (prior PCP and neurology records). And Petitioner consistently reported that his pain began immediately upon vaccination. Exs. 9-10, 14-15.

Because Petitioner has satisfied the requirements of a Table SIRVA, he need not prove causation. Section 11(c)(1)(C). And, other than the duration of Petitioner's symptoms (discussed in Section I.D.), Respondent does not dispute that Petitioner has satisfied the other requirements of Section 11(c), regarding the vaccination received and the lack of other award or settlement. Section 11(c)(A) & (B). Thus, Petitioner is entitled to compensation.

## II. Compensation to be Awarded

### A. Legal Standards for Pain and Suffering Awards

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Sections I and II of *Pello v. Sec'y of Health & Hum. Servs.*, No. 24-1896V, 2026 WL 2211341, at *1-3 (Fed. Cl. Spec. Mstr. July 14, 2026).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[14]

### B. Parties Arguments Related to Compensation

Acknowledging that his case should be considered a mild SIRVA, Petitioner seeks $25,000.00 for past pain and suffering. Brief at 19-21. He favorably compares the facts and circumstances in his case to those experienced by the petitioners in *Hiatt* and *Turnquest*[15] - decisions featuring awards of $25,000.00 and $30,000.00, respectively. Brief at 19-20.

Characterizing Petitioner's injury as "very mild" and treatment as "extremely limited" (Opp. at 19), Respondent contents Petitioner should be awarded "a lower amount" (*id.* at 22). He emphasizes Petitioner's clinical course – consisting of only medication and a HEP, initial reliance on emails to a medical school classmate, only one orthopedic visit – more than a year post-vaccination, and the lack of further treatment – such as surgery believed to be unwarranted by the orthopedist and a steroid injection which Petitioner failed to pursue. *Id.* at 20. Insisting that the two cases cited by Petitioner involved more extensive treatment for a longer duration, Respondent instead proposes

---

[14] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[15] *Hiatt*, 2025 WL 1542314; *Turnquest v. Sec'y of Health & Hum. Servs.,* No. 21-0065V, 2024 WL 3665961 (Fed. Cl. Spec. Mstr. July 2, 2024).

*Tillman*[16] – a case in which I issued a substantive entitlement ruling while suggesting that the appropriate compensation should be lower than $15,000.00.

In response, Petitioner "emphasize[s] that the level of pain he experienced as a result of his injury was more moderate than mild, despite his decision to self-treat his injury." Pet. Reply at 21. Highlighting that he acknowledged 70 percent improvement but reported a pain level of three to four out of ten when seen by the orthopedist more than a year post-vaccination, he theorizes that his pain level was at least five to seven initially. *Id.* at 21-22. Petitioner insists his hypothesis is supported by the VAERS report filed in February 2021, and information contained in the declarations he and his wife submitted. *Id.* (citing Exs. 1, 14, 17).

### C. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury. In determining appropriate compensation for pain and suffering, I have carefully reviewed and taken into account the complete record in this case, including, but not limited to: Petitioner's medical records, filings, and all assertions made by the parties in written documents. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases, and relied upon my experience adjudicating these cases. However, my determination is ultimately based upon the specific circumstances of this case.

The medical records show that Petitioner suffered a mild SIRVA requiring minimal treatment. Although he characterized his initial pain as "terrible" (Ex. 14 at 7) and later estimated its level as five to seven (Brief at 22), Petitioner reported good relief from pain medication began one-month post-vaccination (Ex. 10 at 1). By five months, he described his condition as 70 percent improved which he later qualified to be a pain level of three to four. Ex. 14 at 7; Ex. 15 at 2. During this initial period, Petitioner relied primarily on advice from an orthopedist he knew from medical school. He attended his only orthopedic visit approximately one-year post-vaccination. Although Petitioner and his spouse insist that his symptoms continued thereafter (Ex. 1 at ¶ 16; Ex 17 at ¶ 8), there is nothing in the record to support their assertions.

The *Tillman* case that Respondent proposes as comparable differs from the circumstances in Petitioner's case in several significant ways. Even when not seeking treatment, Petitioner was taking Meloxicam to manage his pain. Ex. 4 at 27; Ex. 10 at 1;

[16] *Tillman v. Sec'y of Health & Hum. Servs.,* No. 22-0762V, 2025 WL 2605951 (Fed. Cl. Spec. Mstr. Aug. 5, 2025).

Ex. 14 at 7; *see Tillman*, 2025 WL 2605951, at *1 (showing only a recommendation for PT – not pursued, prior to the *Tillman* petitioner's initial nine-month gap in treatment). And the *Tillman p*etitioner's minimal treatment should be afforded more weight because, as an electrician, he did not have Petitioner's ability to self-treat. *See Tillman,* 2025 WL 2605951, at *1.

Rather, I agree that the comparable cases cited by Petitioner - *Turnquest* and *Hiatt* - offer the most helpful guidance. Both petitioners' symptoms were mild, and they also required only minimal treatment. *Turnquest,* 2024 WL 3665961, at *5-7; *Hiatt,* 2025 WL 1542314, at *1-3, 10. However, the *Turnquest* petitioner actively treated during the initial three months of his SIRVA, which also occurred in the Fall 2020. *Turnquest,* 2024 WL 3665961, at *5-6. And he was to proceed with arthroscopic surgery when he stopped treating for eight months. *Id.* at *6. Thus, the pain and suffering award here should be slightly lower, but close to that awarded in *Hiatt.*

## Conclusion

Petitioner has provided the evidence needed to establish the required six-month severity, and his shoulder injury meets the definition for a Table SIRVA. Thus, causation is presumed, and Petitioner is entitled to compensation in this case. Furthermore, I find that $**25,000.00** represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[17]

**I therefore award Petitioner a lump sum payment of $25,000.00, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[18]

[17] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[18] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master